No. 30. — THOMAS W. CHIPMAN, plaintiff in error *vs*. WILIE BARRON, defendant in error.

[1.] The Inferior Court may review and annul an order absolute against a Sheriff at a subsequent term, upon motion, when it is made to appear that he was not in contempt; and its action is subject to revision by the Superior Court, by writ of *Certiorari*.

*Certiorari.* From Monroe Superior Court. Tried before Judge FLOYD. September Term, 1846.

For the facts see the decision of the Supreme Court.

CHARLES J. McDONALD and JAMES S. PINCKARD, for the plaintiff in error.

ZACHARIAH E. HARMAN and ANGUS M. D. KING, for the defendant in error.

The counsel for the plaintiff made the following points :

1st. That the order of the Court in the first instance being illegal, the same Court had authority to supersede it, and we cite 6 *Bac. Ab.* 410, *Supersedeas B.*

2d. The Inferior Court ruled the Sheriff on the ground of contempt, and the Court has a discretionary power over all cases of contempts, and therefore had authority to reverse its own illegal order. 1 *Bailey's R.* 607, 608, 647.

3d. That there was no vested right in Barron that could not be reached by the Court, and that his remedy is preserved on the bond taken by the Sheriff. *Prince,* 424.

4th. That the Inferior Court having a discretionary power over cases of contempt, the Superior Court cannot control it, unless in the exercise of this discretion it violate some established principle of law.

C. J. McDONALD argued as follows:

In this case the original *fi. fa.* was issued on the foreclosure of a mortgage against Hugh Lockett. Hugh Lockett filed an affidavit of illegality, that no part of the money was due, or in other words that Wilie Barron, who had been his security and for whose indemnity the mortgage was given, was discharged from all liability in consequence of indulgence having been given by the person to

Chipman *vs.* Barron.

whom he was bound as security to his principal. On filing this affidavit the Sheriff received the bond of the defendant, with good and sufficient security, in terms and agreeably to the requisitions of the Act of 1838, page 145. The levy was made and the property was delivered to the defendant, as the Sheriff was bound by the statute to deliver it to him.

At a subsequent term of the Inferior Court, a *rule nisi* was moved against Chipman the Sheriff, and he was ruled to pay the money, although the property had never been returned to him after the dismissal of the affidavit of illegality, which had been previously dismissed.

Several terms of the Inferior Court elapsed when the Sheriff, Chipman, moved to set aside the rule absolute on the grounds stated in the proceedings, which are substantially, that he was not in contempt, the property never having been produced by the defendant.

It is conceded on all hands, that the Sheriff was not in contempt, and that the rule absolute ought not to have been awarded against him. He had levied the *fi. fa.* and the defendant filed his affidavit of illegality. The Act of the Legislature required him to take a bond. He could not retain the possession of the property. The duty of the Sheriff was the same, if it should be considered that the bond was taken under the Act of 1799, *Prince* 424, prescribing the mode of proceeding under mortgage *fi. fas.* instead of this Act of 1838. The failure of the defendant to produce the property did not place the Sheriff in default, and not having been in default, he ought not to have been ruled for money. The remedy of the plaintiff is on the bond taken by the Sheriff and not against the Sheriff. The Sheriff is clearly irresponsible unless he shall have taken an insufficient bond, and then only to an action. It is not pretended that the bond taken by the Sheriff is not good and sufficient in terms of the Act of 1838. The Inferior Court satisfied of the error it had committed in ruling the Sheriff to pay the money, has rescinded the rule, but has protected the plaintiff by requiring the Sheriff to assign the bond to him. For the flagrant injustice done the Sheriff by the erroneous judgment of the Court there is no remedy, if it should be held that the same Court cannot supersede its illegal order; while the plaintiff has an ample remedy on the bond taken by the Sheriff in obedience to the laws.

But it is maintained by the Court below on the hearing of the

*certiorari* from the Inferior Court, that that Court had no control over its proceedings after the expiration of the term. The application was not to alter the *minutes* of the former term of the Court, but to rescind a rule which had at a prior term, been improperly granted. The minutes of each term stand perfect, the one rescinding an order which appeared on the other.

With all due respect to the Court below, I maintain that it was competent for the Inferior Court to supersede its own illegal order. Any court of record, at Westminster, may in term time, award a writ of supersedeas to any writ or process which has issued from the same court. 6 *Bac. Ab.* 410; *Supersedeas B.* If a capias or an exigent have been awarded against a person, he may in term time, have a writ of supersedeas out of the same court which awarded it. *Ibid.* The order for rescinding the rule absolute, which to all intents and purposes is a supersedeas, was in term time, and a notice to the adverse party.

The Sheriff was ruled, because of his contempt of the process of the court in not having the money according to its exigency. The court has a discretionary power over all cases of contempts, and this discretionary power is indefinite and unlimited as to time; and is necessarily so, and it is immaterial whether it is for the redress of a private injury or not. When a Sheriff neglects his duty in failing to collect money, or pay over money when collected under execution, the attachment which is awarded against him, is partly a criminal and partly a civil process. It proceeds against the Sheriff on the ground that he has not done his duty to the party, and to compel him to put the party in as good a situation as he would have been in, had he discharged his duty. 1 *Bailey's R.* 607. If the Sheriff were to refuse or neglect to arrest a defendant under a *ca. sa.* it would perhaps be a difficult matter for him to prove that by the arrest of the party at the time he would not have collected the money, but not so with regard to a process against the property. But if the Sheriff has discharged his duty and the court improperly rules him to pay the money, the party at whose instance he has been ruled, will suffer no injury from the Sheriff, (who was guilty of no misconduct) if the rule be rescinded, while the Sheriff will suffer a great injustice if it be not rescinded. Is there no *locus penitentiæ* for the Court, if it has injured its officer by an illegal order? Unquestionably. For, even when the Sheriff has actually injured a party and has been ruled, and afterwards shows that he is unable through poverty or misfortune to put the

party procuring the attachment in as good a situation as he would have been had he done his duty, and he has returned the execution, he might be discharged *under the discretionary power of the court over all cases of contempts.* 1 *Bailey's R.* 608. If the Court, then, has ruled the Sheriff for a contempt, when he was not in contempt, but had discharged his duty according to law, has not the same Court, under the discretionary power which it has over all cases of contempts, authority to discharge the rule? There can be no doubt on this point.

In the case under consideration, the party Barron, sustained neither delay nor loss by the misconduct of the Sheriff, for he had been guilty of no misconduct. The Sheriff received the bond of the defendant, as the law and his duty obliged him to do. But had he been in contempt and the party had sustained neither loss nor delay thereby, then the Sheriff by doing what he ought to have done in the first instance, might be discharged. *Murdoch McLean* vs. *C. C. B. DuBose,* 1 *Baily's R.* 647. The Inferior Court had as much authority over this case as the Superior Court could have over one of its cases of contempt, and it would be an extremely hard doctrine to hold, that if a court in the exercise of a discretionary power, had inflicted an injury on its officer, it could not relieve him by the exercise of the same discretion. Mr. Barron is not without his remedy. He has it on the bond which the Sheriff took.

There is no greater vested right in Barron than there is any party in whose favour an erroneous verdict has been rendered, or an erroneous decree pronounced. They are all subject to be set aside.

*By the Court*—NISBET, J. delivering the opinion.

The following are the facts disclosed in this record. The defendant in error, Wilie Barron, was surety upon a promissory note for one Hugh Lockett, and took from his principal a mortgage upon certain negroes, to secure himself from ultimate loss. Having the debt to pay he foreclosed his mortgage, before the Inferior Court of Monroe County. The mortgage *fi. fa.* was placed in the hands of the plaintiff in error, Thomas W. Chipman, who was then Sheriff of said County, and by him levied upon the negroes named in the mortgage, he taking from the defendant a forthcoming bond. At the day of sale the negroes were not delivered to the Sheriff, and the defendant interposed an affidavit of illegality, and gave to

the Sheriff the bond in such cases required by law, conditional to produce to him the negroes levied upon, in the event that the illegality should not be sustained. At the June Term, 1841, of the Inferior Court, the illegality was heard and dismissed, and the execution ordered to proceed. At the December term of the same year the Sheriff, Chipman, having failed to make the money, the plaintiff in the *fi. fa.* moved a rule *nisi*, calling upon him to show cause, instanter, why he should not pay over the amount of the execution, upon the ground, as the rule recites, that he had levied the *fi. fa.* upon property sufficient to satisfy it, and that sufficient time had elapsed for raising the money. The Sheriff answered to the rule *nisi*, setting forth the illegality and bond, and that the property had not been delivered to him according to the condition of the bond; and claiming, on that account, that he was not in contempt, and that the rule be discharged. The Court, however, upon the hearing of the answer, granted a rule absolute, requiring the Sheriff to pay the money due on the *fi. fa.* on or before the first day of the next succeeding term. At the next succeeding term, to wit, in June, 1842, the money not being yet paid, and the plaintiff in execution being about to sue out an attachment against the Sheriff, " the matter (says the return of the justices) was adjusted between the parties in some way not officially known to them." The petition of the defendant in error to the Superior Court for the *certiorari*, states this adjustment to have been, the execution of Chipman's note to him, with security for the amount of the execution. The petition further states, that suit is now pending upon that note. Thus the matter stood until December, 1845, when Chipman, having previously given Barron notice, appeared before the Inferior Court and moved the Court to annul or rescind their order absolute, upon the ground that it was granted contrary to law; and that, in consequence of the illegality and bond, and the failure of the defendant to produce the property, he was not in contempt; which motion was sustained by the Court, and the rule absolute rescinded. Upon *that decision* the case was taken before Judge Floyd, by writ of *certiorari*. Upon the hearing of the *certiorari*, counsel in behalf of Chipman moved to dismiss the writ, upon the ground that the Superior Court has no right or power to revise the action of an Inferior Court in relation to contempts, the order annulled being an amercement against the Sheriff for a contempt of the Inferior Court, in disobeying its process. The presiding Judge overruled the motion to dismiss, and *that decision* is

Chipman *vs.* Barron.

one of the errors specified in the bill of exceptions, and now presented for our consideration. The Court below further ruled, that the Inferior Court had not, under the circumstances of this case, the power to review and annul the action of the same court at a preceding term; that is, that it had not the power, in 1845, to rescind the rule absolute against Chipman passed in 1842; and *that decision* is claimed in the bill of exceptions to be erroneous, and is also presented for the revision of this Court. Having thus arrived at and exhibited the points in controversy, we proceed to their consideration.

The opinion of the able Judge who presided in this cause [1.] in the Court below, on the first point, is thus briefly recited in the bill of exceptions. "Over that class of contempts where parties move under the statute for the payment of money in an Inferior Court, the Superior Court has a revisory power." The Court seems to intimate an opinion that there is a class of contempts over which the Superior Courts have no revisory power. The class of contempts doubtless which was in the mind of the Court, are such as affect not immediately the interest of parties, but such as derogate from the dignity, impede the business, and thereby lessen the usefulness of the court; for example, disobedience, in the presence of the court, to its order, indecent or libellous language uttered in the presence of the court, or boisterous conduct. These contempts invoke the *punishing power* of the court alone, which is exercised by fine, or commitment, or otherwise. The power to punish for contempts of this character is incident, at common law, to all courts of record, and is indispensable to the respectability and proper efficiency of any court. What are and what are not contempts in England, it is difficult to determine, the doctrine there is not very accurately defined; and, although the subject has for centuries received the attention of the sages of the law, may be considered as still, to some extent, unsettled. The labour and responsibility of determining what are the true rules upon this subject, as derived from the English books, do not now, fortunately, devolve upon this Court, for this reason; no question is made in this record as to what acts are contempts, it being conceded, by the Court below, that the rescinded order absolute against the Sheriff was founded on an omission, to wit, a failure to execute a process of the Court; which omission is recognised by our own statute as a contempt. So jealous have been the people of this country of this arbitrary, yet as we believe indispensable power of the courts, so vigilant have they been over the personal liberty of the citizen, that the

29

doctrine of contempt has been defined by legislation in most of the States, our own included. In many instances it must be conceded that the Legislature has so limited the power of the courts as to leave their efficiency, and that popular reverence for them, which in this country is conservative beyond any thing else, to the mercy of the lawless, the tumultuous and licentious. The Civil Code of Louisiana for example, admits punishment for contempts, only after indictment and verdict of guilty by a jury. There, it would seem to me, the power must be nugatory. There are contempts of court, beyond all question, which must be at once and decisively punished, or the court is liable to be not only impeded but arrested, and irrecoverably obstructed in its duties. The Judiciary Act of the United States of 1789, gave to the courts of the United States power to punish by fine or imprisonment, at the discretion of the courts, all contempts of authority in any cause or hearing before them. But the Act of Congress of 2d March, 1831, ch. 98, limited and defined this power, by declaring " that the power to issue attachments, and inflict summary punishments for contempt of courts, shall not extend to any cases except to the misbehaviour of any person in the presence of the court, or so near thereto as to obstruct the administration of justice; and the misbehaviour of any of the officers of the said courts in their official transactions, and the disobedience or resistance by any officer of said courts, party, juror, witness, or any other person, to any lawful writ, process, order, rule, decree, or command of the said courts." Upon this act of Congress Chancellor Kent passes this guarded censure: " It is a very considerable, if not injudicious, abridgment of the immemorially exercised discretion of the courts in respect to contempts." Our own act defining contempts is a literal copy of the law of Congress of March, 1831, to which I shall again advert. To return now from this brief, but I trust not wholly unprofitable digression. Whether the Court below intended or not to intimate an opinion as to the power of the Superior Courts in Georgia to review the action of Inferior Courts, in relation to contempts which involve no immediate pecuniary private interests, and which look alone to a maintenance of the authority of the court itself, is in no way important; because, if such intimation was intended, no exception was taken upon it, and we are not, therefore, called on to express our opinion. One thing, however, we will say, and that is that such a revisory power, under like circumstances, has been seriously questioned in both England and America. The question now made is

this, has the Superior Courts the power, by writ of *certiorari*, to review the decision of the Inferior Court, annulling its order absolute against the Sheriff, to pay over money that he had failed to raise upon a *fi. fa. ?* The order was passed originally upon the assumption that the Sheriff was in contempt; it was annulled upon the assumption that he was not in contempt. Is the action of the Inferior Court upon this species of contempt final, or is it subject to review and control by the Superior Court?

Both in regard to the first and second points made in this cause, it is desirable to determine the character of the proceeding against the Sheriff. By counsel for the defendant in error, it is called a civil proceeding, in the nature of a suit by the plaintiff in execution against the Sheriff, for the recovery of the money which he has neglected to raise ; and the rule absolute is the judgment of the Court upon the issue made, which vests in the plaintiff in execution certain rights, one of which is, to have process of attachment to enforce it; which process is equivalent to an execution upon ordinary judgments. This argument is based chiefly upon our statute, which makes the Sheriff liable to an action on the case, or an attachment for contempt of court, at the option of the party injured. The rule *nisi* and the rule absolute, which are preliminary to an attachment for contempt, argue the counsel, are statutory proceedings; and the plaintiff in execution acquires the same rights in the judgment of the Court upon his rule, as he acquires in the judgment of the Court upon an action on the case against the Sheriff for the same cause. On the other hand it is contended that the proceeding is criminal in its character; that the inception and conclusion of the procedure are founded upon an alleged contempt, and that the order absolute is the judgment of the Court, that the Sheriff is in contempt, and an amercement because of that contempt. If the defendant in error be right and the judgment of the Court as expressed in the rule absolute, be like any other judgment founded on a civil proceeding exclusively, then indeed there can be no question whatever of the power of the Superior Courts to review that judgment, or which is the same thing, the judgment which annuls it. The reasoning however, of the counsel on both sides goes too far; quite too far. The right to move by attachment, conferred by the statute, is one which existed before the statute granted it; it is only declaratory, in this particular, of the common law ; and I cannot conceive, that because by statute the plaintiff may proceed by attachment as for a contempt of the court,

that therefore the character of the proceeding is altered, and that therefore the law of contempts is altered, or the power of the Court over contempts changed. All the statute does is to declare that the plaintiff may if he pleases, invoke the power of the Court over its officer for a contempt, and command its process of attachment, to constrain the Sheriff to compensate him for the injury he has sustained by his disobedience to the process of the Court. It leaves the law of contempt and the law which characterises the proceeding, just as it found it. The proceeding by rule *nisi* against the Sheriff is dissimilar in many respects to a suit. It does not issue like process to a writ properly filed, as matter of right. It must be moved in term, and is granted or refused at the discretion of the Court. *Because* the Court has the discretion of proceeding or not against its officer for a contempt, and because the rule *nisi* goes upon the assumption, and in truth recites those facts which the law declares shall constitute a contempt, *therefore*, the Court will exercise a sound discretion, and either grant or refuse the rule. The statute which declares that disobedience to a process of the Court shall be a contempt, does not oust that discretion which at common law belongs to all courts of record, as to their action on the contempt. And when the plaintiff takes the remedy by attachment, he takes it subject to the law which regulates the power of the court over its officer for a contempt, and that law clothes the court with power to move against him or not at its discretion. The rule issues in the name of the court; it is a mandate to the officer to appear and answer, to what? not to a cause of action set forth in the rule, but to an allegation that he has disobeyed (in this case) the process of the Court, and therefore (is the legal inference,) is in contempt. Whether it is returnable instanter or upon time, is also with the court. Now what is the object of the rule in the first instance? Take the case before us. The rule *nisi* declares that the Sheriff has levied upon property sufficient to satisfy the plaintiff's execution, and that he has had sufficient time to raise the money and has not done it.

Now what is the object of this rule? It is to ascertain whether the facts be true, whether the Sheriff is in contempt or not. To this end he is called upon to show cause. And when the cause is shown, if any, or if none, then, upon the default of the Sheriff, the court proceeds to give its judgment. And what is the court to adjudge? why, manifestly whether the Sheriff be in contempt or not. The judgment, then, what is it? what was the judgment

upon the rule *nisi* in the cause under review? Let its words be what they may, the legal effect of the order absolute is two-fold. 1. It finds the issue against the Sheriff; that is, it finds him in contempt. And 2. It adjudges, in consequence of his being in contempt, that he, at a future day, pay the money to the plaintiff who has been injured by that contempt. We do not agree with the counsel for plaintiff in error that this order is an amercement—a punishment by way of fine, for the contempt; we think that it is a declaration, that according to law, in consequence of the contempt, the Sheriff is bound to pay the money due to the plaintiff. It is important to observe, that the order was not that the Sheriff pay over the money *at once*, but on or before the first day of the succeeding term of the Court. So that, by the terms of its order, its own execution is suspended. This fact proves this, to wit, the Court did not view it in the light of punishment, but did postpone the exercise of its punitive power until a future day. There was no exercise of the penal powers of the Court; *that* does not begin until the attachment issues for disobedience to the final order. That disobedience is a new contempt, in which the authority of the Court is more especially concerned. The action of the Court in this case terminated with the granting of the rule absolute.

In the case of Bonafous *vs.* Schoole, reported in 4 *T. R.* 316, the court say: "But this defendant is in custody on an attachment for non-payment of costs; which, in whatever light it may have been considered when the cases cited from *Co. Pract.* were determined, *has, of late years, been deemed to be only a civil execution; so much so, that a person charged in custody on such an attachment is entitled to be discharged under the Lords' Act.*" So in the King *vs.* Myers, reported in 1 *T. R.* 265. Buller, J. says, "it has been settled of late years, that an attachment for the performance of an award is only in the nature of a civil execution." In the King *vs.* Davis, reported in 1 *Bos. & Pull.* 336, the defendant was imprisoned on an attachment for non-payment of money to the plaintiff in a cause, and was brought up to be discharged under the Lords' Act; the court held that he was dischargeable, *saying that an attachment for the non-payment of money was an execution.* In South Carolina, and in New York, one imprisoned under an attachment to pay money has been held to be within the provisions of the insolvent laws of those States respectively. 1 *Bailey So. Ca. R.* 607; 3 *Paige R.* 40 *a* 42.

In Rex *vs.* Stokes, *Cowp.* 136, the Court considered an attach-

Chipman *vs.* Barron.

ment to be an execution in a civil suit, so far as it was intended to enforce an obligation, or the performance of a duty, as between party and party, and as a matter wholly between them, unconnected with the offence itself, *Cowp.* 136; 3 *Paige* 41, 42 : for example, in case of money due to a plaintiff, sought to be enforced by attachment. In this designation is embraced one class of attachments for contempts. Another class is founded on the exercise of the penal power of the Court, in which individuals are not directly interested ; as to enforce a fine upon an officer for disobedience to an order in open court and are criminal processes. 1 *Bailey So. Ca. R*, 607.

And a third class is illustrated by the case before us, founded on the neglect or omission of an officer of court, or other person, to obey its process. These, according to the opinion of the Court, in *ex parte* Thurmond, reported in 1 *Bailey So. Ca. R.* 605, 606, 607, have a two-fold character. The attachment, says the Court, "is partly a criminal and partly a civil process. It is criminal in form and effect, so far as it is designed to punish the Sheriff for his neglect; but, so far as its effect is, to redress the injury of the party who procures it to be issued, by compelling the Sheriff to place him in as good a situation as he would have been in had the Sheriff done his duty, it is generally a civil process." 1 *Mill.* 151 ; 4 *McCord,* 237.

If the attachments are civil proceedings, or criminal processes, or mixed, according to the foregoing classification, then *a fortiori,* the rule *nisi* and the rule absolute, in cases where these precede the attachment, are of the same character. In this case no attachment issued; and, guided by the principles and authorities hereinbefore exhibited, we are of opinion that the proceeding before the Inferior Court was, in the extent to which it did in fact go, a civil proceeding ; and that if attachment had issued upon the final order, then it would have partaken both of a civil and criminal character. We are not, however, to be understood as giving to this proceeding all the characteristics of a suit, or to the order absolute all the attributes of a judgment. Although, in our judgment, it is in the nature of a civil proceeding, yet it is one *sui generis*, distinguishable eminently from ordinary suits and judgments, in the fact and the consequences which result from that fact, that both the rule, and the judgment thereon, are founded upon a contempt of court.

By the Constitution of this State, the Superior Courts are clothed with power "to correct errors in Inferior Judicatories by writ of

*certiorari.*" *Prince* 910, *Const. art.* 3, *sec.* 1.   The Judiciary Act of 1799, in providing for the exercise of this power declares, that " where either party in *any cause,* in any Inferior Court, shall take exceptions to *any proceedings in any case* affecting the real merits of such cause, the party making the same, shall offer such exceptions in writing, which shall be signed by himself or his attorney; and if the same shall be overruled by the Court, it shall and may be lawful for such party, on giving twenty days notice to the opposite party or his attorney, to apply to one of the Judges of the Superior Court, and if such Judge shall deem the said exceptions to be sufficient, he shall forthwith issue a writ of *certiorari,* &c.; and said Superior Court shall determine thereon and order the proceedings to be dismissed, or return the same to the said Inferior Court, with order to proceed in the said cause." *Prince* 432. With the view of the character of this proceeding which we have presented, and under the broad grant of corrective powers conferred upon the Superior Court under the Constitution and the Act of 1799, we are satisfied that the Court below did right in refusing to dismiss the writ of *certiorari.*

We however, are compelled to differ from the Court below on the second assignment of error.   The power of the Inferior Court to vacate its *solemn judgment, rendered in due course of law upon suit brought,* upon the ground that it had misapplied or misapprehended the law, upon motion, may be well questioned, and is not asserted by this Court.   The old common law writ of *audita querela* would not relieve in such a case, nor a writ of error *coram nobis,* nor a motion to arrest.   The ground for annulling *this order absolute,* is not irregularity in the proceeding, or fraud; if it were the latter, equity might relieve.   As before stated, the ground taken by the Inferior Court as appears from the return to the *certiorari,* is that the "rule absolute was granted improperly and illegally; because said Chipman was not in contempt of court, having taken a bond with good security for the forthcoming of the property, on the filing of the affidavit of illegality, as he was required by law to do."   We do not consider the annulled order in the light of *such a judgment,* and therefore the law as applicable to an act vacating such a judgment, does not apply as we conceive to this case.

The Court below admits the power of the Inferior Court to have reviewed their order during the term, at which it was passed, but thinks that the power of review ceased with the term.   This we suppose is simply asserting the power incident to all courts of

record, of correcting their records before they are made up and signed; and to this proposition there can be no objection. We however claim for the Court, the power to *review and annul* this order at a subsequent term. Nor do we perceive that any valid objection to it grows out of the state of the record, after the rescinding order is passed. The record of a cause does not necessarily consist of the action of the Court at any one term, but may be constituted of a series of actions in the same cause, at different terms. The whole record is to be taken together; one part explaining another. Thus a judgment may be obtained upon the final hearing on appeal and the record of the term closed, and still at a subsequent term, if there be sufficient cause, it may be arrested. We do not see that so far as the record is concerned, this cause differs materially from that.

The Court is further represented, in the bill of exceptions, as ruling (and here we take occasion to regret that this Court cannot always have the opinion of the Court below more fully presented than it usually is, for we are conscious that our opinions wear the appearance sometimes of doing less than justice to the decision which it is our duty to review,) that the Inferior Court exceeded its power in revoking the rule absolute at a subsequent term, so far as the revocation affected the rights which the plaintiff acquired under it. So far as rights had *vested* in Wilie Barron, under that rule, we agree with the Court, that they could not be divested by its revocation. That he did settle with Chipman by taking his note, with security for the debt, is averred in his petition for the *certiorari.*

But the return does not show that this averment is true or false. We must consider *that* as a fact not established. And if it was we would not then be called upon to give any opinion as to whether that settlement vested any rights in the plaintiff, and as to the effect which the revocation of the order would have upon the right of the plaintiff to recover upon Chipman's note. We would leave those questions to be determined by the court before which they might be raised. Aside from these considerations, we cannot see that there was any *right of property,* or of *franchise* vesting in the plaintiff by virtue of this rule absolute, like that *vested* right which is held by jurists every where to be irrevocable, and with which neither the Judiciary nor the Legislature can interfere. Before proceeding further, we may state at once that, in our judgment, the Court had the power to annul this order, by virtue of that *discretion and control which courts of record may exercise over contempts.* That they have

such discretion, is conceded throughout all the learning upon this subject, from the time of Lord Bacon to this day. The discretion to declare an officer in contempt or not, involves the power to annul the judgment or declaration that he is in contempt, otherwise how shall a party in contempt ever purge the contempt. We admit that the discretion is to be exercised according to law, to some extent; but we do not admit that every act which the court may do, or omit to do, is ascertained by a legal rule; something must be left to the exercise of the best judgment of the court, guided by justice, under' the various phases which a case of contempt may assume. We do not mean to say that this discretion extends to the determination of what are or are not contempts; we mean to confine the use of the word to the action of the court in *declaring* a contempt, permitting it to *be purged, and removing or relieving against the punishment of it.* We may safely say that, in the law which limits or restrains the discretion referred to, there is not to be found a principle which inhibits a court from annulling an order declaring a contempt against its officer, when it is made to appear to that court that the officer is not and had not been in contempt. That this officer was not in contempt when the rule absolute was passed is obvious, nay palpable. It was his duty to receive the illegality, and it was likewise his duty to receive the bond, and to deliver the property levied upon to the defendant. The bond is given for the benefit of the plaintiff—his security was in that—and had the Sheriff refused to deliver the property, upon a tender of the bond, he would have been liable to the defendant. *Acts of* 1838, *Pamph. page* 145. How, then, could he have been in contempt, when his return showed that the illegality had been filed, and bond given, and that the property had not been returned to him. The Inferior Court misjudged the law of the case, and declared the Sheriff in contempt; this being the case we think it was within their power, and certainly their duty, to place the Sheriff in the condition he was in before the order was passed; this they could do only by revoking the order, the effect of which was to remit the plaintiff also to the rights and remedies which he had before the order was passed. Even in cases where the court has issued its penal process, and the officer is committed, where he is in execution at the instance of a plaintiff under an attachment, and where the commitment might be with plausibility claimed as the *plaintiff's satisfaction*, even in such cases the officer has been considered within the provisions of the insolvent laws. A surrender of all his effects

being considered as a purgation of the contempt. And in such cases, upon such surrender, it has been held, that the officer might be discharged upon motion. This is not one of those cases, but a much stronger case, in this, that *here* there was no commitment, no attachment issued, but only the preliminary judgment, that the Sheriff was in contempt, and an order giving time to pay the money. See the authorities before cited, also *Bacon's Ab. Title Courts, E;* 1 *B. & Ald.* 192; *Barnes,* 11; 10 *Bingham,* 434; 3 *Paige,* 40, 41, 42; 1 *Hill N. Y. R.* 171; 7 *T. R.* 156; 3 *Desaussure R.* 269; 4 *McCord,* 237. "Even in cases (says Sewell) where the proceedings are perfectly regular, and have been properly commenced and continued, the courts exercise a discretionary power to stay them on terms." *Sewell's Law of Sheriff, page on the margin,* 422.

The case *ex parte Thurmond,* 1 *Bailey,* 605, which I have before referred to, is considered by this Court as sustaining the grounds which they have taken. That was a case where the Sheriff had been ruled to pay over money collected on a *fi. fa.* and committed under an attachment for contempt. He filed his schedule and asked to be discharged under the insolvent laws of South Carolina; he was opposed upon the ground that a Sheriff committed to jail under an attachment for a contempt, is not entitled to the benefit of the insolvent laws. The Circuit Court discharged him and an appeal was taken. The same grounds were taken before the Appeal Court against his discharge; the Court held that he was entitled to a discharge under the insolvent laws of Carolina and sent the case back with instructions. O'Neall, J. in delivering the opinion of the Court says, "in the present case we are untrammeled by precedent, and the Court concludes that where the Sheriff shows that he is unable through poverty or misfortune to put the party procuring the attachment, in as good a situation as he would have been in, had he done his duty, and he has returned the execution, he *might be discharged under the discretionary power of the Court over all cases of contempt.*" They however thought it best in that case to let the discharge be effected by the usual course under the bankrupt laws.

In the case of the *People* vs. *Nevins,* 1 *Hill N. Y. R.* 171, Nevins was ruled to pay money collected as an attorney before the Supreme Court of New York, and committed to jail under an attachment for contempt. A commissioner for the county of Erie discharged him by writ of *habeas corpus,* and his action was brought before the Supreme Court of New York by writ of *certiorari.*

The Court reversed the order of discharge for want of jurisdiction in the commissioner, and in delivering the opinion of the Court, Cowen, J. says: "and if the imprisonment were not warrantable, *we would have discharged the prisoner on motion.*"

Under such a view as we have now given of the discretionary power of the Inferior Court over contempts, we return to the inquiry, what right or interest vested in the plaintiff in this order absolute?

Upon the supposition that the Sheriff did neglect his duty; the plaintiff is injured, he is placed by the default of the officer in a worse condition than he would have occupied, if he had done his duty; the default is at the same time a contempt of the authority of the Court; the plaintiff comes then into court and suggesting the contempt, invokes the power of the Court over the contempt to redress the wrong done him. The right of invoking that power does not divest the Court of its discretion; that continues, and so long as it is exercised in furtherance of the plaintiff's interest, there can be no conflict between him and the Court. But when that discretion does not subserve his views there is a conflict — and which shall yield! The discretion of the Court or the supposed, or actual interest of the plaintiff? The latter, or otherwise the Court has *no discretion;* it becomes, like its process, but the agency by which the plaintiff collects his money. And right or wrong, whether in contempt or not, *a process for contempt,* is used to compel the Sheriff upon pain of perpetual imprisonment, to pay to him the amount of his judgment against a third person. And suppose it turns out, as it did in this case, that the Sheriff is not in contempt; then the very contingency upon which the law makes him liable to the plaintiff, fails, and if the Court cannot prevent it, he recovers against him without law and without equity. We conclude then that all the right which the plaintiff had under this order absolute, was the right, subordinate to the power of the Court to annul it, to ask and have the process of attachment to enforce the payment of the money, and when it was annulled that right fell to the ground. And why (in this case the record showing that the Sheriff was not in contempt,) should he (plaintiff) complain? the revocation of the order remits him to the position, which whether good or bad, the law gave him before it was passed. He still has his judgment unimpaired, and the bond with security which the defendant gave for the forthcoming of the property. We do not believe therefore, that any argument against the power

of the Court to revoke this order can be drawn, from the rights which the plaintiff had in it. Let the judgment of the Court below be reversed upon the second assignment of error.